IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

LORI TOWNSEND,                          )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        NO. 09-3194
                                        )
ST. JOHN'S HOSPITAL OF THE              )
HOSPITAL SISTERS OF THE                 )
THIRD ORDER OF ST. FRANCIS,             )
an Illinois not-for-profit corporation, )
                                        )
        Defendant.                      )

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Defendant's Motion for Summary

Judgment.

I. INTRODUCTION

Plaintiff Lori Townsend filed a Complaint, wherein she asserted that

Defendant St. John's Hospital of the Hospital Sisters of the Third Order of

St. Francis ("the Hospital" or "St. John's") violated her rights under the

Family and Medical Leave Act ("FMLA" or "the Act"), 29 U.S.C. § 2615

et al.  In Count 1, Townsend alleges the conduct of St. John's interfered

with her rights under the FMLA, in violation of § 2615(a)(1). In Count II, Townsend asserts St. John's discriminated against her in retaliation for using her family and medical leave ("FML") benefits, in violation of § 2615(a)(2).[1]

The Hospital seeks the entry of summary judgment as to both counts. It claims Townsend's FML benefits were exhausted by August 20, 2007, a date on which she was medically unable to return to work. Thus, the Hospital alleges it did not interfere with the use of her benefits. Even if the benefits were not exhausted, Townsend was unable to perform the essential functions of her job on September 3, 2007. As to Count II, the Hospital asserts that Townsend does not have sufficient evidence of a retaliatory animus to withstand the entry of summary judgment.

Townsend claims that there are genuine factual disputes as to both counts, thus precluding the entry of summary judgment.

## II. FACTUAL BACKGROUND

St. John's is an Illinois not-for-profit corporation which provides

---

[1]The Plaintiff's original Complaint had three counts. However, Count III was dismissed in an Order entered on February 11, 2010.

2

healthcare services at a facility located in Springfield, Illinois.  Townsend was a registered nurse who was employed by St. John's to work as a case manager in the Hospital's case management unit.  She is a citizen of the United States and an Illinois resident.  The Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1337, and 29 U.S.C. § 2617, and venue is proper in this district.

A. Job description and functions

As a case manager for the Hospital, Townsend examined medical records located in certain medical treatment units of the Hospital and conferred with physicians, health insurers, and staff of the Hospital with respect to those medical records.  Townsend developed the discharge plan in collaboration with the patient, physician, payor and interdisciplinary team and assigned accountability for aspects of the plan of care.

The Plaintiff regularly worked five days a week, Monday through Friday, from 7:30 a.m. to 4:00 p.m.  She was primarily assigned to the fifth floor cardiac unit, where she was required to cover all three nursing stations on the floor, located approximately 100 feet apart.  Townsend reported to

Larry Deal, Case Management Coordinator, who reported to Debbie Woodford, Director of Outcomes Management.

The Hospital contends that the physical demands of Townsend's case manager position required that she be capable of stooping, bending, stretching and lifting, able to tolerate variable amounts of standing, walking and/or sedentary activity and possess manual dexterity to handle and manipulate equipment and appliances. Townsend disputes that the position required some of these as physical essential functions.

At the beginning of her shift, Townsend usually went to her office on the fifth floor to retrieve her laptop and any books or notes she needed for the day. She carried her laptop and books in a rolling suitcase. She would then plug in her laptop in the dictation room on the fifth floor, walk out to the nurses station to retrieve a chart, which was usually two or three inches thick, walk back to the dictation room and put the reviews in the laptop based on what was listed in the chart. The Plaintiff states that she did not carry a laptop for the last six months of her employment. Townsend reviewed 25 to 35 patient charts daily, and was thus required to repeat this

4

action up to 70 times a day.  Townsend notes that the case manager usually worked within a few feet of the revolving chart rack.  According to the Hospital, charts were not always on the rack and sometimes had to be located in different places.

The Hospital asserts that Townsend's supervisors testified that case managers also had direct involvement with patients, talked to patients about their discharge needs, worked with the social worker to assist with home need preparation, and conferred with patients and families at the time of discharge.  Moreover, case managers were held to the same standards as nurses that are in patient rooms taking care of people, insofar as they should not be wearing open toed shoes.  Townsend disputes some of these aspects of the case manager job description.

The Hospital further contends that case managers needed to be mobile because they had to go in and see patients and were required to travel to the case management office on the second floor about two or three times a day.  Moreover, Townsend admitted that she was required to go to an office on the second floor of the hospital to retrieve Medicare letters and

5

deliver them to patients.  Townsend disputes these alleged facts and claims she was only rarely required to deliver a Medicare letter to a patient. Except for that purpose, Townsend alleges that she had no other reason to go to a patient's room.  Case managers on other floors had more patient interaction.

St. John's next asserts that Townsend acknowledged the job requirements as follows: a case manager is required to be able to walk while carrying or pulling supplies; be in and out of patient's rooms to interact with patients and families; and interact with physicians, staff, nurses and other health care team members, sometimes at a moment's notice. Townsend disputes this statement, suggesting that the position is more sedentary than is reflected in the job description.

### B. St. John's FMLA policy and Townsend's FMLA leave

The Hospital had an FMLA policy in its Employee Handbook allowing for up to 12 work weeks of leave for eligible employees.  Under the policy, the 12-week period was calculated on a calendar year basis, rather than rolling year.  Since the Hospital instituted its FMLA leave policy that

rests with the calendar year, approximately 20 employees have taken leave during back-to-back years.  When an employee is on FML, it is the responsibility of her supervisor to track time taken to assure that it does not exceed 12 weeks.

There was no Hospital policy that stated an employee could not return to work unless it was with a physician's full release without restrictions.  Every case was handled individually.  In each case, Human Resources Coordinator Kathy Maxey would look at the physician restrictions and the employee's health to determine if the employee could function within the restrictions.  Woodford believed that depending upon the position, a Hospital employee would be allowed to resume work with restrictions.

Under Hospital policies, an employee must give evidence of her ability to return to work through documentation from the physician. Documentation would include: (1) any restrictions; (2) the type of work to be released to perform; and (3) whether it is a full or partial release.  This policy permits an employee to resume previous duties with evidence of her

7

ability to resume those previous duties.

When the employee is certified by a physician as able to return to work at a time after the expiration of FML, the employee can return to his position if it has not been filled.  Otherwise, the employee would have a job search period.  The job search period is 60 days.  If an employee does not locate a position within that period, she is terminated.  No preference is given to the employee in competing for a position.

From May 10, 2006, to at least May 3, 2010, Townsend was treated for depression by her physician, Dr. Sarma, or a physician within his practice, on an ongoing basis.  In 2006, she took FMLA leave for depression.  Townsend did not take more than 12 weeks for this leave in 2006, and she returned to her case manager position after that leave.

The Plaintiff took another two weeks of leave for depression in early 2007, from February 12, 2007 through February 23, 2007.  Her treating physician, Dr. Sarma, provided Townsend with a return to work letter, dated February 26, 2007, which stated that Townsend had been "unable to work from February 12– 23rd" due to her medical condition, but was

8

released back to work "without restriction" on February 26, 2007.

Later that same year, on June 9, 2007, Townsend fell from a ladder at her home and fractured the talus bone in her right ankle.  She was referred to Barry Mulshine, M.D., an ankle specialist.  Townsend underwent surgery on June 18, 2007, to repair the fracture in her ankle.

After her surgery, the Plaintiff's right ankle was in a splint similar to a cast and it was non-weight bearing.  Townsend was unable to walk for a period of time.  She used a wheelchair before her physician allowed her to walk with crutches.  Townsend cannot recall when she quit using the wheelchair, but she used crutches simultaneously and also then wore a boot with a hard bottom and velcro straps.  While wearing the boot, her toes were covered by socks.

Townsend began taking leave for the ankle injury on June 11, 2007.  At the time, she was an employee in good standing with no disciplinary issues.  On June 13, 2007, St. John's sent Townsend information on its FMLA policy, a leave of absence request form and a request for health care provider certification, which she received.  In connection with her leave

request, Townsend submitted an FMLA Leave Request Health Care Provider Certification completed by Dr. Mulshine on June 26, 2007, which stated that Plaintiff's current health condition has a "probable duration through September 2007." It further stated that she should not work until re-evaluated on July 3, 2007, and thereafter would be seen at 2 to 4 week intervals. Townsend saw Dr. Mulshine on July 3, 2007, at which time her ankle was put into a cast. She saw Dr. Mulshine again on July 31, 2007. On that date, her doctor removed her cast, put her in an immobilizer boot and told her to remain non-weight bearing at that point. The Plaintiff was released for sedentary work if transportation was provided to her. At the time, Townsend was instructed to use some device such as crutches for walking to avoid putting weight on her ankle. Townsend made arrangements with her father for transportation to and from work.

C. St. John's leave update request

On July 17, 2007, St. John's Human Resource Coordinator Kathy Maxey sent a letter to the Plaintiff requesting an update from her physician regarding her return to work date. At that time, Maxey mistakenly believed

10

Townsend's FMLA expired on August 26, 2007, so she specifically requested information as to whether Townsend was able to return to work before that date. When Maxey received the FMLA leave request from the Plaintiff, it did not include a beginning date for the leave. Maxey referred to Townsend's time card report and saw that June 4 and June 5 of 2007 were designated as unpaid time off and mistakenly assumed June 4, 2007, was the start date of the Plaintiff's leave, instead of a vacation day. Maxey wrote June 4 on the FMLA leave request form that was sent to Townsend, but wasn't informed by the Plaintiff that the start date was wrong until August 23, 2007.

The Hospital alleges that on or about July 31, 2007, Dr. Mulshine responded to its update request and stated that Plaintiff's return to work date was still "unknown" but that it would be "after August 26, 2007." Dr. Mulshine further stated that Plaintiff was to perform "no work until re-evaluated in four weeks." St. John's received Dr. Mulshine's response on August 1, 2007. The Plaintiff disputes these allegations, citing a "Nurses Note" dated July 31, 2007, from Dr. Mulshine's office, which provided in

11

pertinent part, "May return to work for sedentary duty only – if transportation is provided.  Otherwise no work until re-evaluated in 4 weeks." At the time Dr. Mulshine sent in the update on Townsend's return to work, Townsend was still on non-weight bearing crutches and a boot.

The Hospital alleges Townsend admitted that she did not feel capable to return to her position as of July 31, 2007, because she could not perform all the duties of the case manager position.  Moreover, the medical restrictions provided by Dr. Mulshine on the July 31, 2007, update were not going to change before her next appointment at the end of August 2007.  Townsend disputes this allegation and claims she was capable of performing sedentary duty on July 31, 2007.  Townsend says she was bored and wanted to go back to work.

Townsend asserts that following her July 31, 2007 appointment with Dr. Mulshine, she told Deal she would like to return to work.  She claims that Deal stated that Townsend could not return to work because she was using crutches and her ankle was in the boot.  He also said Townsend could not return to work with any restrictions.  The Hospital disputes these

allegations, claiming that at her deposition, Townsend did not recall Deal saying that she could not return to work with any restrictions.[2]

D. Whether Townsend could return to work without restrictions

(1)

On July 17, 2007, Maxey understood that Townsend's FML would end on August 26, 2007. Maxey assumed that was the end of the twelve weeks. After receiving Dr. Mulshine's note on August 1, 2007, Maxey talked with Deal and Woodford. Along with other employees, they made the decision that Townsend was not allowed to return to work. Maxey is not aware of anyone from the Hospital asking what the physician meant by "sedentary."

Townsend claims that, at the time of her July 31, 2007 doctor appointment, she was relying upon the information she had received from the Hospital that she would have a full twelve weeks of FML available to

---

[2]In her Affidavit which was executed in April 2012, Townsend claims that Deal told her that she could not return to work with any restrictions. At her deposition approximately one year earlier, when asked generally whether she recalled what Deal had said, she remembered only him saying that there were no sedentary jobs.

13

her.  Because her leave began on June 11, 2007, and she was informed by the Hospital that she would be entitled to 12 weeks of leave time, she calculated the ending date of the leave to be September 2, 2007.

Townsend alleges that if she had not known that her FML would terminate earlier than September 2, 2007, she would have made a follow-up appointment with Dr. Mulshine at a time shortly prior to the expiration of her FML.  Because she believed that her leave would not end until early September 2007, Townsend scheduled an appointment with Dr. Mulshine for August 28, 2007.  The Hospital asserts that, regardless of what Townsend now claims, Dr. Mulshine had already stated on July 31, 2007, "No work until re-evaluated in four weeks."

St. John's asserts that, based upon Dr. Mulshine's unequivocal statement that Townsend could not return to work until after August 26, 2007, the Hospital went forward in filling her case manager position. Townsend disputes this allegation, saying there was no unequivocal statement from Dr. Mulshine that she could not go back to work on July 31, 2007.  Moreover, Townsend claims her position was filled before then.

14

On August 8, 2007, Maxey drafted a letter to be sent from Townsend's supervisor informing her that "[d]ue to the needs of the Case Management Department, [her] position ha[d] been filled." On August 10, 2007, Deal and Woodford called Townsend to inform her that the position had been filled due to the urgent needs of the department, which had been without a case manager for two months. Townsend states she was told the case manager position was filled several weeks before August 10, 2007. The Hospital alleges that documents produced to Townsend confirm that management decided to hire her replacement after they received the note from Dr. Mulshine that Townsend would not return to work until after August 26, 2007.

The letter from Maxey informed Townsend that upon her release to work, she would have a period of 90 days in which to apply for vacant positions for which she was qualified. Deal incorrectly indicated that Townsend had been on FML since June 4, 2007, and her 12 weeks of leave for calendar year 2007 would be exhausted on August 26, 2007. Deal further stated that he understood from Townsend's physician that she

15

would not be released to return to work until after August 26, 2007.

On August 10, 2007, Deal believed Townsend's leave would exceed twelve weeks.  If Townsend was able to come back after the expiration of the 12-week period, Deal and Woodford understood she could apply for any position for which she was qualified.  She would be considered in good standing with the Hospital.  However, Townsend would not be guaranteed a position.  On August 10, 2007, Townsend spoke by telephone to Deal and Woodford.  During that conversation, she was told that the Hospital had hired an individual to replace her.  At the time, she was in the eighth week of her FML.  Townsend alleges that during the conversation, Deal said that the new case manager who was hired to fill her position started orientation on July 23, 2007.  St. John's disputes this assertion as to the number of weeks of FML that had been used by August 10, 2007, and on the basis that Townsend's replacement did not report for orientation until September 10, 2007.

Townsend's FML was not over on August 8, 2007, when Deal's letter was written.  On August 23, 2007, Townsend met with Maxey at the

16

Hospital to inform her that St. John's was using the wrong date as the beginning of her FMLA leave. The Hospital then calculated her FMLA leave expiration date as either September 2 or 3, 2007. August 23, 2007, may have been the first time Woodford was aware Townsend's FML was extended into early September 2007.

(2)

Townsend alleges that at the time of her meeting with Maxey, she was not using crutches. During that meeting, Townsend never indicated to Maxey that she was not yet bearing weight on her right ankle. The Hospital disputes these allegations, stating that Maxey testified she witnessed Townsend using crutches on August 23, 2007, and an email Maxey drafted following the meeting documented that she was doing so. Moreover, Townsend testified at the time of her deposition that she did not know if she was using crutches on or around August 28, 2007, though she was fairly certain she was not. In her subsequent Declaration, Townsend stated that she was not at the time of her meeting with Maxey. Moreover, she claimed she never indicated that she was not yet bearing weight on her

17

right ankle.

On August 28, 2007, Townsend saw Dr. Mulshine again.  By then, she was weight bearing and wearing regular shoes.  Townsend was ten weeks out from surgery and Dr. Mulshine allowed her to officially progress to weight bearing and immobilizer boot.  Dr. Mulshine noted that Townsend would be able to tolerate doing her regular job if she used crutches and told her she still wouldn't be able to drive while she was partially weight bearing.[3]  Dr. Mulshine observed that Townsend had very good motion across her ankle and there was some bone thinning, which he said was a good sign that the fracture was healing.  Dr. Mulshine or his staff provided a Nurses Note for Townsend stating that she could return to work on September 3, 2007, but should be permitted to wear a boot and use crutches as needed.  He told Townsend that she could wean herself out of the boot and into a regular shoe as she was able to fully bear weight on the ankle.  According to Dr. Mulshine, some people progress to the weight

---

[3]The Plaintiff clarifies this assertion by stating that Dr. Mulshine did not instruct her to use her crutches.  According to Dr. Mulshine's testimony, Townsend reported to him that she could do her regular job if she used crutches.  *See* Mulshine Tr. 19.

18

bearing stage very quickly.  He felt comfortable allowing Townsend's pain to guide her with respect to the need for crutches and boots.  Townsend was on the faster side compared to most people in attaining weight bearing status.  She did very well in her recovery from the fracture.  The Hospital alleges that Townsend's relatively quick recovery is immaterial because she could not return to work at the end of her FMLA entitlement on August 20, 2007, and could not return to work without restrictions by September 3, 2007, as indicated by Dr. Mulshine's notes from July 31, 2007, and August 28, 2007.

In paperwork Townsend submitted in 2007 to the Illinois Department of Human Rights ("IDHR") in connection with her charge against St. John's, the Plaintiff stated, "I only needed my boot on 9-3-07 for one week."  She also provided notes to the IDHR, one of which states "I wore my removable boot for only 1 more week after being released for my own emotional support."  At her deposition, Townsend could not recall the date she stopped using crutches or the date she stopped using the boot, though

she believed it was a few days before the meeting on August 28, 2007.[4]

After Townsend saw Dr. Mulshine on August 28, 2007, she took the return to work slip directly to the Hospital.  St. John's alleges that, on August 29, 2007, the Plaintiff called Maxey to discuss her physician's release to return to work, stating that she was still non-weight bearing on crutches and wearing a boot.  Townsend disputes this allegation, noting that Maxey had no independent recollection of that fact.  Indeed, Maxey was presented with an exhibit which refreshed her recollection.  According to the exhibit, Maxey did send an email to Nancy Hopkins on that date wherein she stated that Townsend would be released to return to work the following week, but that she would be "non-weight bearing on crutches and wearing a boot."  *See* Maxey Tr. 65.  Despite the email, Townsend denies telling Maxey that she would be non-weight bearing, using crutches and wearing a boot.  Although Townsend also disputes this assertion on the

---

[4]The Plaintiff purports to clarify this assertion by stating that she could not recall only the date she stopped wearing the boot.  However, the cited portion of her deposition (pp. 155-57) supports the Hospital's assertion that she also could not recall when she stopped using crutches. *See* Townsend Tr. 156:5-8.

basis that it is contrary to the testimony of Dr. Mulshine, Dr. Mulshine was not a party to the conversation between Townsend and Maxey.

(3)

The Plaintiff alleges that either Deal or Maxey told her she could not return to work with restrictions. She asked Dr. Mulshine to send another note to the Hospital allowing her to return to work without restrictions. The nurse mistakenly listed the return to work as September 10, 2007. It should have been recorded as September 3, 2007. The nurse later wrote a note to correct the date. This note was provided to the Hospital on November 20, 2007.

As a supervisor at the Hospital, Deal was not aware of any policy that prohibited an employee from returning to work with restrictions. Restrictions would be considered on a case by case basis. Townsend alleges that by late August or early September of 2007, she was able to do everything she was able to do before her accident without pain.

The Hospital next alleges that, after consulting with Human Resources and Employee Health, Deal and Woodford determined that

21

Plaintiff could not return to work because she could not perform the essential job functions of wheeling her suitcase and carrying charts while she was using crutches and because the presence of crutches on patient floors presented a serious risk to patient and employee safety.  Townsend claims she was not on crutches at that time.

Deal and Woodford both also said working would be a problem if Townsend was wearing a boot.  They believed that boots should not be worn in patient care areas for infection control issues given the close proximity to bodily fluids and germs.  However, Townsend claims her wound had healed and her foot was covered which prevented any risk of infection.  St. John's further alleges that boots were a risk in nursing units given how busy they are.  Townsend objects, claiming that because she worked on the cardiac floor, she did not work in patient care areas and rarely had to go to the Case Management Office.  Moreover, Townsend would have returned to work wearing the boot for only one week--during the week of September 3, 2007.

The Hospital alleges that case managers needed to be mobile because

they had to visit patients, obtain charts, have access to the case management office on the second floor, and were working in patient care areas. Townsend asserts that case managers generally do not have to walk quickly in order to do their jobs.

By August 28, 2007, the Plaintiff asserts she was able to walk for 30 minutes and stand for unlimited amounts of time without suffering any pain. Townsend claims that she never requested an accommodation for returning to work after her appointment that day with Dr. Mulshine. She did not lead the Hospital to believe she needed an accommodation. St. John's disputes this assertion, claiming that Townsend did provide medical documentation providing that she should use a boot or crutches as needed. Moreover, no one at the Hospital ever asked Townsend what the day to day physical demands were of her as case manager. The Hospital notes that it was aware of the position's physical demands.

On November 27, 2007, the Hospital's Director of Human Resources wrote to Townsend. In his letter, he stated that the Hospital's personnel action in replacing her position was based upon a nurse's note of September

4, 2007, indicating that Townsend could return to work full duty on September 10, 2007.  St. John's claims this allegation is immaterial because it did not receive the nurse's note until after the expiration of Townsend's FMLA entitlement.

E. Open positions and other claims

St. John's sent Townsend a letter on September 12, 2007, informing her that she had a period of 90 days in which to apply for other positions for which she was qualified.  Jean Kapp, the Employee Relations Manager, stated that she understood Townsend was unable to return to work before the expiration of her FML on September 3, 2007.  The Hospital placed her on inactive status and offered her the opportunity to apply for open positions for which she was qualified upon her release to work.  Although Townsend claims she applied for many positions, the Hospital states that the evidence shows she applied for only two.  She received one opportunity to interview.  Townsend was being considered for a position when her work search period ended in December 2007, so St. John's extended her job search time frame.  She was not hired for the position she was being

24

considered for in December 2007.

When she failed to secure a position, the Plaintiff's employment with the Hospital was terminated on January 11, 2008.

Townsend identified three individuals working for St. John's that she believed to be similarly situated employees. Of those three individuals, two were not case managers and did not report to the same supervisors as she did. The Plaintiff alleges that Maxine Brown, a registered nurse, wore a boot in the cath lab of the Hospital. She also wore braces. Brown was not a case manager, did not have the same supervisors, worked on a different floor in a different department, and was allegedly injured prior to 2000.

Another individual, Karen Bender, was identified by the Plaintiff as using crutches for about three weeks in 2006 or 2007 while working in a case management position on the sixth floor. However, Townsend did not know any circumstances around her allegation that Bender used crutches other than she had "hurt her knee" and was on crutches for about three weeks. Neither of Townsend's supervisors, Deal or Woodford, recalled Bender working as a case manager while using crutches. Deal had no

recollection of Bender's injury.  Although Woodford recalled Bender's knee injury, she did not remember whether Bender used crutches or any other assistive devices.

The Hospital alleges Bender worked mainly as a floater performing documentation services rather than significant case manager duties. Townsend claims that Bender would work on various units in the Hospital depending upon its need for case manager duties.  Moreover, Townsend was familiar with Bender's work duties including when she was assigned to the sixth floor.  Patients on the sixth floor generally had longer Hospital stays than did patients on the floor where Townsend was assigned. Frequently, case managers on that floor had to deliver Medicare letters to patients.  The Hospital contends that these allegations are immaterial because Bender's supervisors, hospital leave staff, and employee health did not know she performed all of these duties.

## III. DISCUSSION

### A. Legal standard

Summary judgment is appropriate if the motion is properly supported

26

and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the Plaintiff.  *See Siliven v. Indiana Dept. of Child Services*, 635 F.3d 921, 925 (7th Cir. 2011).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  *See id*.

B. Interference with FMLA benefits

The FMLA provides, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  To prevail on an FMLA interference claim, a plaintiff must show that: (1) she was eligible for the Act's protections, (2) her employer was covered by the Act, (3) she was entitled to leave under the Act, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA

27

benefits to which she was entitled.   *See Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).  The only issue is as to the final element–whether the Hospital denied Townsend benefits to which she was entitled.

St. John's contends that Plaintiff's FMLA leave was exhausted by August 20, 2007, at which point Townsend was entitled to no additional FMLA benefits.  Townsend claims that it was exhausted in early September of 2007.  Moreover, she alleges the Hospital is barred by the doctrine of equitable estoppel from asserting that the end date was August 20, 2007.  Townsend further asserts that, even if her FML was exhausted by that date, there is a genuine issue of material fact as to whether she was capable of resuming her duties at the Hospital by August 20, 2007.

The Plaintiff cites *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579 (7th Cir. 2000), in contending that the Hospital is equitably estopped from arguing that Townsend's FML was exhausted by August 20, 2007.  *See id*. at 582.  The court in *Dormeyer* stated:

> Like other equitable doctrines, the doctrine of estoppel is invoked in a variety of statutory contexts without reference to particular statutory language.  True, if the statute creates or excludes a right to plead estoppel, the creative power of the

28

administering court or agency is suspended. But there is
nothing in the Family Leave and Medical Act that relates to
misleading eligibility notices or absences of notice; so far as
notice is concerned, the statute merely requires the employer to
post a general summary of the Act in the workplace. 26 U.S.C.
§ 2619. We do not read this provision to exclude the
application of the doctrine of an estoppel in an appropriate
case. And so an employer who by his silence misled an
employee concerning the employee's entitlement to family leave
might, if the employee reasonably relied and was harmed as a
result, be estopped to plead the defense of ineligibility to the
employee's claim of entitlement to family leave.

*Id*. In *Peters v. Gilead Sciences, Inc.*, 533 F.3d 594 (7th Cir. 2008), the

Seventh Circuit referred to and did not disapprove of its discussion of

equitable estoppel in *Dormeyer*, though *Peters* also was not an appropriate

case to determine if a defendant is barred from asserting a defense like the

one raised by St. John's in this case. *See id*. at 598-99.

Townsend further notes that a number of circuits have recognized the

applicability of equitable estoppel to bar an employer from asserting a

defense akin to the one now raised by the Hospital, when the employer's

conduct in some respect prejudiced the rights of the employee. *See Kosakow*

*v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 722-26 (2d Cir.

2001); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 493-95 (8th Cir.

29

2002); *Murphy v. FedEx National Ltl, Inc.*, 618 F.3d 893, 899-901 (8th Cir.
2010); and *Minard v. ITC Deltacom Communications, Inc.*, 447 F.3d 352, 358-
59 (5th Cir. 2006).

The Hospital claims that an employer's failure to initially designate
time off as FMLA-qualifying does not necessarily mean that the employee
is entitled to additional time.  *See Ragsdale v. Wolverine World Wide, Inc.*, 535
U.S. 81, 89-90 (2002).  Moreover, an employee must establish prejudice in
order to obtain relief for a FMLA violation.  *See id.*, *see also Franzen v. Ellis
Corp.*, 543 F.3d 420, 426 (7th Cir. 2008).

St. John's alleges that, even assuming equitable estoppel is recognized
within the Seventh Circuit, Townsend cannot establish prejudice for the
Hospital's failure to notify her that her FMLA leave expired on August 20,
2007, because she was not able to perform the requirements of her job by
that date.[5]

---

[5]It is also questionable whether Townsend could show that she
reasonably relied on the Hospital's failure to designate her time off in
February 2007 as FMLA-qualifying.  Because Townsend would also have
been aware that she was on FMLA leave for two weeks approximately six
months prior to August 20, 2007, any reliance on the Hospital's
oversight might not be reasonable.

When the evidence is viewed in a light most favorable to Townsend, there is information in the record tending to show that Dr. Mulshine released her to sedentary work July 31, 2007, if Townsend could arrange for transportation, which she was able to do. The problem is that although the Plaintiff alleges now that her job was "sedentary," that assertion is contrary to the job description of the case manager position, the accuracy of which Townsend did not dispute. Moreover, Townsend's answers to questions at her deposition demonstrate that her job was not sedentary in nature. Thus, although the record establishes that Townsend was released for sedentary work before August 20, 2007, her job was not a sedentary position. To the extent that Townsend argues she would have scheduled a doctor appointment in order to obtain an earlier release if she knew that her FML expired on August 20, 2007, that assertion is speculative at best based on the July 31, 2007 form provided by Dr. Mulshine.

On the same July 31, 2007 form that provided Townsend may perform sedentary duty, Dr. Mulshine indicated that her return to work date was "unknown" but would be after August 26, 2007. Although

31

Townsend now claims that she no longer needed crutches by that date and testified in 2011 that she did not know but was fairly certain that she was no longer using crutches at that time, Maxey testified that she observed Townsend on crutches on August 23, 2007. A contemporaneous email from Maxey documented this observation. On August 28, 2007, Townsend also told Dr. Mulshine that she could tolerate doing her job by using crutches. Townsend's 2012 affidavit stating that she was not using crutches by August 23, 2007 appears to be self-serving and simply is not credible. It thus does not create a factual dispute on the issue. Although a witness may by affidavit "clarify or expand upon" deposition testimony that is ambiguous or incomplete, *see Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999), the Court is unable to conclude that Plaintiff's memory is accurate regarding whether she was using crutches one year after her deposition and almost five years after the meeting with Maxey.

The Plaintiff was re-evaluated on August 28, 2007. Dr. Mulshine released Townsend to return to work on September 3, 2007. Based on these undisputed facts, the Plaintiff is unable to establish prejudice due to

the Hospital's failure to notify her that her FML expired on August 20, 2007, because she could not perform her job duties by that date.  Upon viewing the facts in a light most favorable to Townsend, the Court concludes that her interference claim fails because she cannot show that St. John's denied benefits to which she was entitled.

Because she was no longer actually entitled to FMLA benefits, summary judgment is warranted in favor of the Hospital on Townsend's interference with benefits claim as alleged in Count 1.

### C. Retaliation claim

(1)

An employee alleging FMLA retaliation may proceed under the direct or indirect methods of proof that are often seen in employment discrimination litigation.  *See Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012).  Pursuant to the direct method, she "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two."  *Id*. (citation omitted).  "A plaintiff can prevail under the direct method by

33

showing an admission of discrimination or by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.* at 827 (internal quotation marks and citation omitted). The "convincing mosaic of circumstantial evidence" may include factors such as suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similarly situated employees being treated differently, or evidence that the employer provided a pretextual reason for the termination. *See Jajeh v. County of Cook*, 678 F.3d 560, 570 (7th Cir. 2012).

An employee proceeding under the indirect method of retaliation must produce evidence that although the employee was performing her job satisfactorily, she was treated differently from similarly situated employees who did not request FMLA leave. *See Smith v. Hope School*, 560 F.3d 694, 702 (7th Cir. 2009). Townsend states that she is proceeding under both the direct and indirect method.

Initially, St. John's cites a few district court cases which have held that a plaintiff's FMLA retaliation claim necessarily fails if her interference claim

is rejected.  Those cases are unpersuasive, in that they require a plaintiff to meet a higher threshold than *Scruggs* or any other Seventh Circuit case discussing the evidence an FMLA plaintiff must present.  Moreover, the Seventh Circuit has recently addressed the merits of a plaintiff's retaliation claim after first rejecting his interference claim.  *See Scruggs*, 688 F.3d 826-27; *see also Nicholson v. Pulte Homes Corp.*, _ F.3d _, 2012 WL 3217620, at *7-8 (Aug. 9, 2012).  Accordingly, the Court declines to hold that its ruling with respect to Townsend's interference claim precludes her retaliation claim.

(2)

Townsend alleges that pursuant to the direct method, there is circumstantial evidence of a retaliatory motive.  Townsend utilized a benefit available to her under the Act when she took her FML.  She was eventually terminated when her FML expired.  At the time of her injury, Townsend was a fully satisfactory employee in good standing with the Hospital.  Townsend's position was filled before the expiration of her FML.  Townsend was informed of that fact on August 10, 2007 and, although it

is not clear exactly when the hiring decision was made, a document produced in discovery suggests that the date of decision was August 8, 2007. The record establishes that Townsend's successor was notified of the decision on August 17, 2007, and told that she would begin on September 10, 2007.

The Plaintiff further alleges that when Maxey, the Hospital's FML coordinator, realized she had made a mistake in calculating Townsend's available FML time and that her leave would not expire until September of 2007, she expressed the hope that Townsend's physician would not release her to work by that date. Maxey testified that the reason she felt that way was because she felt bad about getting the date wrong. Townsend suggests that the reason Maxey expressed that hope is that her case manager position had already been filled.

Next, the Plaintiff asserts that although St. John's did not have a blanket policy preventing an employee from returning to work with physician restrictions, the determination was made on a case-by-case basis. Townsend claims that Hospital has no sensible explanation for why she

could not return to work if she were using crutches when another case manager, Karen Bender, was the previous year allowed to return to work while on crutches.  It is not entirely clear how much longer Townsend may have needed crutches upon returning to work, though it appears it would have been no more than the two weeks that Bender claims to have used crutches at work.

The Plaintiff next asserts that when she informed Deal on June 11, 2007, of her injury, Deal told her that he could make sedentary work available when she was able to return to work.  However, Deal would not permit her to return when she was medically cleared six weeks later to do sedentary work.  The Hospital claims that although Townsend so testified in her "self-serving affidavit," the assertion is immaterial based on Townsend's perception of how long she would be away from work versus how long she actually was away from work.  Moreover, it is immaterial because the Hospital was under no obligation to find her sedentary work.

Townsend asserts that for these reasons, there is at least a genuine issue of material fact as to whether there is a connection between her FML

and the Hospital's unwillingness to return her to her position. Moreover, there is a factual question as to whether the Hospital reasonably believed that Townsend was incapable of performing a case manager's duties. Townsend claims there is sufficient evidence of a retaliatory motive under the direct method.

(3)

When certain inferences are construed in the Plaintiff's favor, the Court concludes that factual disputes preclude the entry of summary judgment on her retaliation claim when it is considered under the direct method. There are factual questions regarding whether there is a causal connection between Townsend's statutorily protected activity in taking FMLA and her termination. Although Townsend has not pointed to any direct evidence of retaliation, the record contains enough circumstantial evidence for the Court to conclude that summary judgment is not warranted.

Factors such as suspicious timing and ambiguous statements can be useful in establishing a "convincing mosaic" of circumstantial evidence. *See*

38

*Jajeh*, 678 F.3d at 570.  It appears that a decision was made on August 8, 2007, to fill Townsend's position.  At the time, Maxey and Deal believed Townsend's FML was scheduled to end on August 26, 2007.  The record indicates St. John's decided to replace Townsend no later than one week after learning from Dr. Mulshine that Townsend would not be released to work until after August 26, 2007.

After Townsend's successor was hired, the Hospital was told that Townsend's FML was extended to September 2, 2007.  Maxey's email to Deal about the mistaken date could be interpreted at least a couple of different ways.  The relevant portion states:

> I don't know if [Townsend's physician] will give her a full release to return to her job as it involves a lot of walking.  Hopefully, he will extend her leave for another week which will get us past the 12-week mark.  It seems doubtful to me that she will be ready to jump back into her regular routine but I could be wrong.

Maxey Tr. 33-34.  The statement could be interpreted in a manner consistent with how Maxey testified–she felt responsible about getting the date wrong, was sorry, and hoped it would not be significant.  At the same

time, Maxey was now aware it appeared that Townsend was entitled to her job until September 2, 2007. She also knew that Townsend's successor had been hired. Thus, a plausible interpretation is that Maxey was expressing hope that Dr. Mulshine would extend the date so that the Hospital would not face what may have seemed like a major dilemma. If Townsend had been released, there would have been two individuals for one position.

Although St. John's was mistaken about when Townsend's FML ended, the Court concludes that it is what the Hospital believed at that time that is significant in determining if it had a retaliatory motive. When the evidence is viewed in a light most favorable to the Plaintiff, a jury could conclude that the Hospital wanted Townsend's FML to expire before Dr. Mulshine released her to work.

Another factor to consider is whether similarly situated employees were treated differently. The Hospital contends that Karen Bender is not similarly situated to Townsend because Bender while using crutches worked on a different floor as a floating case manager, which it claims involved work that was mostly sedentary. Deal and Woodford were not involved in

40

any decision and had no knowledge that Bender used crutches for two weeks in late 2006.  In her affidavit, Bender states that she did not take any leave for her knee injury.  Bender did not recall speaking to Deal and Woodford about using crutches while working and did not remember seeing them while using crutches.  Moreover, Bender did not consult with or seek permission from Employee Health or Maxey regarding her use of crutches in 2006.

The Hospital further contends that Bender and Townsend were not similarly situated because they did not have the same supervisors. However, they need not have "identical employment files."  *See Good v. University of Chicago Medical Center*, 673 F.3d 670, 675 (7th Cir. 2012).  "So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly situated requirement is satisfied."  *Id*. (internal quotation marks and citation omitted).  Although employees typically must deal with the same supervisor in order to be similarly situated, the "inquiry is a flexible one that considers all relevant factors, the number of which depends

on the context of the case." *See Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (internal quotation marks and citation omitted).

Although it is somewhat curious that Bender was not prohibited from using crutches while working, this factor is not particularly probative because she and Townsend did not have the same supervisors and apparently had different job duties. When considered along with the previously discussed suspicious timing and the ambiguous statement, however, the Court concludes that Townsend has presented sufficient evidence under the direct method to create a factual dispute as to whether there is a causal connection between her protected activity and her termination.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that St. John's is entitled to summary judgment on Townsend's claim alleging interference with her rights under the FMLA. However, the existence of factual disputes precludes the entry of summary judgment in the Hospital's favor as to Townsend's FMLA retaliation claim.

<u>Ergo</u>, the Defendant's Motion for Summary Judgment [d/e 30] is ALLOWED IN PART and DENIED IN PART.

The Motion is ALLOWED as to Count 1 and DENIED as to Count 2.

The final pretrial conference remains scheduled for October 24, 2012.

ENTER: September 21, 2012

FOR THE COURT:

*s/Richard Mills*
Richard Mills
United States District Judge

43